AVENT AMERICA, INC., an Illinois corporation, and Cannon Rubber Limited, an English corporation, Plaintiffs,

v.

PLAYTEX PRODUCTS, INC., a Delaware corporation, Defendant.

No. 98 C 2663.

United States District Court, N.D. Illinois, Eastern Division.

June 24, 1999.

Kyle G. French, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, Daniel John Voelker, William Nicholas Howard, Schwartz & Freeman, Chicago, IL, for Plaintiffs.

Michelle C. Burke, Michael A. Pope, McDermott, Will & Emery, Chicago, IL, for Defendant.

## MEMORANDUM OPINION AND ORDER

PLUNKETT, Senior District Judge.

Before the Court is Magistrate Arlander Keys' Report and Recommendation ("Report") recommending that the Court grant Avent America, Inc. ("Avent") and Cannon Rubber Limited's ("Cannon") motion for a preliminary injunction to enjoin defendant from using the name "Avance" to sell baby feeding bottles. Defendant Playtex Products, Inc. ("Playtex") has filed timely objections to the Report and plaintiffs have filed a timely response to defendant's objections in accordance with Fed.R.Civ.P. 72. For the reasons provided in this Memorandum Opinion and Order, the Court finds Playtex's objections without merit and accepts the Report with some modification.

### Facts

Cannon Avent Group PLC ("Cannon Avent Group") is a company that has several subsidiaries, including Avent America, Cannon Rubber, and Cannon Avent Singapore. (R. at 9.) Plaintiff Avent America sells Avent baby feeding products including but not limited to bottles, sterilizers, pacifiers, and a breast pump in the United States. (*Id.* at 13.) There are over seventy different types of products, or Stock Keeping Units (SKUs), sold under the Avent brand name. (*Id.* at 11.) Avent America distributes and sells fifty-five SKUs of Avent products in the United States. (*Id.* at 137.) Plaintiff Cannon Rubber, an English corporation, manufactures, markets, and distributes Avent baby feeding products and a line of automotive accessories. (*Id.* at 10.) Defendant Playtex, a Delaware corporation, sells consumer products including tampons, infant care, and sun care products. (*Id.* at 456.)

In 1982, Edward Atkin ("Atkin"), the managing director of Cannon Rubber, began developing a baby feeding system that more closely replicated the breast-feeding process by incorporating an anti-vacuum device into the nipple skirt. (*Id.* at 14–15.) The bottles in the Avent system are manufactured using the injection stretch blow molding process—a process which results in a smoother internal surface than the extrusion blow molding process. (*Id.* at 37–39.) The extrusion blow molding process, the process used to manufacture Playtex Avance bottles, results in bottles that are more difficult to clean thoroughly due to the intricate cavities on the inside of the bottle created during the manufacturing process. (*Id.* at 38–40, 96.)

In 1984, Cannon Rubber held a contest for a new name to promote its new range of baby products and the winning name was "Avent." (*Id.* at 15.) Subsequently, Cannon Rubber registered the Avent

name in various countries and in 1986, it registered the name in the United States. (*Id.* at 15, 17.) From June 1992 to March 1994, McNeil Baby Care sold and marketed Avent products in the United States. (*Id.* at 134–35.) From April 1994 to the present, Avent America exclusively has sold and marketed Avent Products in the United States. (*Id.* at 135.)

Atkins testified that Avent relies very heavily on word-of-mouth referrals because people do not easily understand the technical benefit of the Avent bottle's anti-vacuum design. (*Id.* at 28.) After using the bottle, a purchaser of the Avent bottle appreciates the way a baby is less stressed due to an uninterrupted milk flow, and then passes on their recommendation to other potential purchasers. (*Id.*) Elizabeth Christie ("Christie"), managing director and CEO of Avent America, also testified on direct and cross examination that at least fifty percent of Avent's business is impacted by word-of-mouth referrals. (*Id.* at 145, 206.) In addition, Avent markets to health professionals because they heavily influence the buying decisions of new and expecting parents. (*Id.* at 141.) Christie testified that one hundred percent of the influence that is accomplished between health professionals and expectant parents is by word of mouth. (*Id.* at 142.)

In 1994, Avent had three million dollars in retail sales for its products in the United States. (R. at 144.) In 1995, retail sales jumped to five or six million dollars. (*Id.*) In 1996, retail sales reached ten million. (*Id.*) In 1997, retail sales soared to twenty million. (*Id.*) Thus, from 1994 to 1997, Avent doubled its retail sales each year. (*Id.* at 205.) Sales of Avent reusable bottles make up approximately forty percent of total retail sales and were also doubling in proportion to sales of the entire product line. (*Id.* at 145–46.) However, in 1998, the year in which Playtex began selling the Avance bottle, Avent retail sales grew sixty percent, which is significantly lower growth than in the preceding years. (*Id.* at 144–45, 205.) According to Christie, Avent America did not change its marketing for Avent products from 1994 through 1998. (*Id.* at 144–45.)

From 1994 through 1998, Avent America spent four million dollars in marketing, promotion, and advertising to promote its products, including advertisements for the Avent Isis Breast Pump, reusable bottle, disposable bottle, sterilizer, pacifiers, storage set, and weaning system. (*Id.* at 150; *see* Pls.' Ex. 1, Media Advertising Paid for by Avent America.) In 1998 alone, Playtex spent one million dollars in advertising solely the Avance bottle. (R. at 542.)

Avent distributes and sells its products to specialty stores and several mass market chain stores, such as Toys 'R Us, Babies 'R Us, Target, Burlington Coat Factory, and Wal–Mart. (*Id.* at 138–39.) Playtex has a much broader distribution for the Avance bottle and sells to national mass market chain stores. (*Id.* at 485.) Although Avent and Playtex products are presented side by side on a number of store's shelves, there are hundreds of stores in which Playtex is selling its reusable bottle that Avent is not. (*Id.* at 203.) Despite Avent and Playtex's different distribution strategies, Christie testified that Avent and Playtex are marketing to the same customer by pricing and merchandising their products very similarly and by distributing their product to some of the same retailers. (*Id.* at 156.) Christie testified that despite Avent's relatively low distribution level, Avent has a good level of awareness, *i.e.*, fifty percent, among consumers. (*Id.* at 628.) Even Richard Powers, president of Personal Products Division of Playtex Products, Inc., acknowledged that a Playtex survey regarding the awareness of various bottles in the industry showed that forty-nine percent of mothers had heard of Avent. (*Id.* at 520.)

Toward the end of 1996, Atkins received an unsolicited letter from Michael Goss, Executive Vice President and Chief Financial Officer of Playtex, in which Playtex stated its interest in purchasing Cannon Rubber, the manufacturer of Avent baby feeding products and a line of motorcar

accessories. (*Id.* at 10, 47; Pls.' Ex. 27, Playtex Letter of 12/4/96, at D01863.) Atkins responded that he was uninterested in selling Cannon Rubber. (R. at 52–53.) Goss, however, insisted that Atkin meet with him and the CEO of Playtex, Mr. Gallaher, when they visited London. (*Id.*)

In January 1997, Goss and Gallaher made a presentation of Playtex to Atkin and stated that Playtex wished to acquire the Avent bottle so that it could become Playtex's premium reusable anti-vacuum bottle. (*Id.* at 54.) Atkin again proclaimed his disinterest in selling Cannon Rubber. (*Id.*) Three or four months later, Playtex selected "Avance" as the name for a new anti-vacuum bottle. (*Id.* at 536.)

Playtex began selling its Avance bottle, an angled bottle with an anti-vacuum device built into the bottom, in Target stores in mid to late December 1997. (*Id.* at 466–67, 485.) In January 1998, the customer service representatives at Avent began receiving calls about an angled bottle, a type of bottle which Avent does not sell. (*Id.* at 153.) In February 1998, those customer calls and concerns were brought to the attention of the managing director and CEO of Avent America, Elizabeth Christie ("Christie"). (*Id.* at 160.) After Christie saw an ad for the Playtex Avance bottle and saw the actual product, she sent a cease-and-desist letter to Playtex. (*Id.*) Over one month later, on April 7, 1998, Playtex responded to Christie's letter and denied that there was any similarity in looks, sound, and connotation. (*Id.* at 161–62; Pls.' Ex. 15.) On April 30, 1998, Avent and Cannon Rubber brought the instant suit against Playtex. (Compl. at 1.)

### Discussion

This matter was referred to Magistrate Judge Keys pursuant to Rule 72(b) of the Federal Rules of Civil Procedure. This Court is required to "make a de novo determination ... of any portion of the magistrate judge's disposition to which specific written objection has been made." Fed.R.Civ.P. 72(b). "The district judge may accept, reject, or modify the recommended decision, receive further evidence, or recommit the matter to the magistrate judge with instructions." *Id.*

■ There are several factors that a court must weigh when considering a motion for preliminary injunction. *Meridian Mut. Ins. Co. v. Meridian Ins. Group, Inc.,* 128 F.3d 1111, 1114 (7th Cir.1997). "First, it must determine whether the moving party has demonstrated ... some likelihood of prevailing on the merits, ... an inadequate remedy at law and irreparable harm if the injunction does not issue." *Id.* "If the party has done so, the court must next consider ... the irreparable harm the nonmovant will suffer if the injunction is granted balanced against the irreparable harm to the movant if the relief is denied, and ... the effect granting or denying the injunction will have on nonparties." *Id.*

### 1. Likelihood of Prevailing on the Merits

■ "In the preliminary injunction context, a 'likelihood of success' exists if the party seeking injunctive relief shows that it has a 'better than negligible' chance of succeeding on the merits." *Id.* (quoting *International Kennel Club of Chicago, Inc. v. Mighty Star, Inc.,* 846 F.2d 1079, 1084 (7th Cir.1988)). In a trademark infringement case, "the movant shows a likelihood of success by establishing that ... (1) he has a protectable mark, and ... (2) that a "likelihood of confusion" exists between the marks or products of the parties." *Id.* at 1115.

■ The first prong has been satisfied because it is undisputed that Avent has a protectable mark. The record shows that Avent registered its trademark in the United States in 1986. (R. at 17.) As the magistrate judge noted, registration of the mark "constitutes prima facie evidence of the ownership and validity of the mark...." *Brach Van Houten Holding, Inc. v. Save Brach's Coalition for Chicago,* 856 F.Supp. 472, 475 (N.D.Ill.1994). Therefore, the Court need only address

the likelihood of confusion prong to determine whether Avent has a likelihood of success on the merits.

■ In this circuit, a court considers several factors to determine whether a likelihood of confusion exists in trademark cases: (1) degree of similarity between the marks in appearance and suggestion; (2) similarity of the products for which the name is used; (3) area and manner of concurrent use; (4) degree of care likely to be exercised by consumers; (5) strength of complainant's mark; (6) actual confusion; and, (7) intent of defendant to palm off his product as those of another. *Helene Curtis Indus., Inc. v. Church & Dwight Co., Inc.,* 560 F.2d 1325, 1330 (7th Cir.1977). "None of these factors by itself is dispositive of the likelihood of confusion question, and different factors will weigh more heavily from case to case depending on the particular facts and circumstances involved." *International Kennel,* 846 F.2d at 1087. Playtex, in essence, attacks the magistrate's findings on each factor.

## A. Similarity of Marks

Playtex argues that the magistrate judge erred as a matter of law in limiting its similarity analysis to the aural similarity of the words "Avent" and "Avance." Playtex's strongly worded objection avers that the magistrate judge's justification for emphasizing the aural similarity is based on "pure speculation." (Def.'s Objections at 10.) The Court finds Playtex's objection without merit.

■ In determining similarity, "the marks must be compared in light of what occurs in the marketplace, not in the courtroom." *James Burrough Ltd. v. Sign of Beefeater, Inc.,* 540 F.2d 266, 275 (7th Cir. 1976). "Side by side comparison is not the test.... The consuming public is unlikely ever to be presented with the opportunity for such comparison." *International Kennel,* 846 F.2d at 1088.

The Court notes that the parties' marks and packaging are visually dissimilar. "Avent" is displayed in a multi-color sans serif typeface on its bottle, packaging, and print advertising while "Avance" is displayed in a red serif typeface on the packaging and print advertising and is embossed into the bottle. (*Compare* Pls.' Exs. 1, 9, 10 *with* Def.'s Exs. 11, 12, 13, 14.) Playtex appears above the "Avance" mark on both its bottle and packaging. (Pls.' Ex. 9.) The "Avent" mark is displayed with the tagline "naturally" in script typeface on its bottle, and in print advertising, the "Avent" mark is displayed either with the tagline or by itself. (Pls.' Ex. 10.)

The dissimilarity between the appearance of the marks and packaging alone, however, cannot carry the day for Playtex. For the record shows, and Playtex readily admits, that there are hundreds of stores in which the Avance bottle is sold in which the Avent bottle is not. (R. at 203.) Thus, in a great number of stores in which the Avance bottle is available, it would be impossible for the public to examine both bottles and notice differences between the marks and their appearance on packaging. Further, there is evidence that, with regard to the products involved, word-of-mouth referrals are particularly likely and thus the parties consider such referrals important.

Playtex cites no controlling authority for its presumption that visual dissimilarity trumps aural similarity in a case such as this and the Court finds none. In addition, the cases upon which Playtex relies are unpersuasive because they fail to address aural similarity where there is a showing of the importance of word-of-mouth referrals.

The Seventh Circuit has discussed both the aural aspect of trademarks in two cases, *Forum Corp. of North America v. The Forum Ltd.,* 903 F.2d 434, 440 (7th Cir.1990), and *Meridian Mutual Insurance Co. v. Meridian Insurance Group, Inc.,* 128 F.3d 1111, 1116 (7th Cir.1997). The *Forum* court stated that "[a]ny memorable feature of a mark, which of course includes the way it sounds, should be considered in analyzing likelihood of confu-

sion." *Forum*, 903 F.2d at 440. It held that the district court erred when it focused on "the parties' printed matter and not the full range of ways that the parties communicate their marks to the public," which included the way one of the parties answered its phone and "the likelihood that much of the parties' business comes by word-of-mouth contacts." *Id.* at 440–41. Moreover, in *Meridian*, the court stated that the visual distinctions between the parties' marks were irrelevant because the record showed that the marks were likely to be used in telephone calls. *Meridian*, 128 F.3d at 1116.

As in *Forum* and *Meridian*, the record shows that there is a likelihood that the marks are used in conversations, whether face-to-face or via telephone. The record includes uncontroverted testimony by Christie, managing director and CEO of Avent America, that approximately half of Avent's business is impacted by word-of-mouth referrals. (R. at 28, 145, 206.) Even Richard Powers, Playtex's Chief Executive Officer, admitted that word-of-mouth referrals are "very important" to both Avent and Playtex. (*Id.* at 523.)[1] Further, merely because Avent advertises in magazines does not diminish its reliance on word-of-mouth referrals. No company is forced to choose word-of-mouth promotion to the exclusion of any other type of product promotion. Therefore, because the record shows the uncontroverted importance of word-of-mouth referrals of Avent products and that the mark is likely to be heard in conversations, the Court finds that the magistrate judge did not err in emphasizing the aural similarity between "Avent" and "Avance".

Further, despite Playtex's arguments to the contrary, the magistrate judge did not err when he compared the possessive form of "Avent", *i.e.*, "Avent's", with "Avance." It does not matter one iota whether such a use of the "Avent" mark is proper in terms of trademark law. What matters is wheth-

er those in the consuming public will likely use Avent in the possessive form, *e.g.*, "Avent's bottle is the best on the market." The Court finds that there is a great likelihood that the public will use Avent in its possessive form, just as it does with any other brand name.

Moreover, it is clear that the marks sound alike. "Avent" and "Avance" have the same number of syllables and the same stress pattern, and, as Dr. Kaye testified, of the forty-eight possible phonemes in the English language, five of the six phonemes in the two words are the same if "Avent" is stated in its possessive form. (R. at 235–36.) The Court thus finds the marks similar. *See, e.g., G.D. Searle & Co. v. Chas. Pfizer & Co.*, 265 F.2d 385, 387 (7th Cir. 1959) (finding Dramamine and Bonamine marks similar based on phonetics).

Lastly, with regard to the suggestion of the marks, the Court finds that the marks suggest only slightly different concepts, with "Avent" signifying an advent or arrival of something momentous and "Avance" signifying an advancement, breakthrough, or new idea. *See* WEBSTER'S II NEW RIVERSIDE UNIV. DICTIONARY (1994). As a result, the Court finds that the marks' connotations are more similar than they are different.

Therefore, the Court finds the "Avent" and "Avance" marks similar because: (1) Avance bottles are distributed much more broadly than the Avent bottle, which makes side-by-side comparison impossible in the majority of instances; (2) Avent relies heavily on word of mouth referrals and there is a tremendous similarity between the aural pronunciation of "Avent" and "Avance"; and (3) the suggestion of the marks is similar. The Court thus finds Playtex's objection regarding the dissimilarity of the marks without merit.

---

1. The testimony elicited by Playtex that a word-of-mouth referral always occurs face-to-face with the baby bottle in hand or fully describes the technological benefits was properly rejected by Magistrate Judge Keys as speculative. (*Id.* at 595.)

## B. Similarity of Products and Degree of Care Used by Customers

■ Playtex opines that because the Avent and Avarice bottles look different and use different anti-vacuum technologies, the magistrate judge erred in finding that the products are similar. Again, the Court disagrees. The Seventh Circuit has not taken such a crabbed view of the similarity of products prong. A court need only find that a product is closely related to that of the trademark owner in order to establish similarity of products. *International Kennel*, 846 F.2d at 1089. "A 'closely related' product is one 'which would reasonably be thought by the buying public to come from the same source, or thought to be affiliated with, connected with, or sponsored by, the trademark owner.'" *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 958 (7th Cir. 1992).

The Avent mark is used to sell a host of products, including baby feeding bottles, breast pumps, storage containers, and pacifiers. Thus, customers may easily believe that the Avarice baby feeding bottle is affiliated with or connected with Avent. Moreover, the probability that customers may reasonably believe the Avance bottle is manufactured by, connected with, or affiliated with the Avent product line is greater based on the fact that the outstanding benefit of both the Avance and Avent bottle is the use of anti-vacuum technology.

Further, Playtex argues that the magistrate judge failed to give weight to the lack of similarity of the products in light of the degree of care customers normally give to baby bottle purchases. Playtex's attempt to bootstrap their "similarity of products" argument to the magistrate's finding that consumers use a high degree of care in purchasing baby bottles is unavailing.

The magistrate judge found that, although bottles are relatively inexpensive, the nature of baby bottles would tend to heighten to some extent the degree of care exercised by consumers. This degree of care may make baby bottle consumers seek out a product with particular benefits, *e.g.*, one that helps prevent colic or reduces air in baby's stomach.

This does not mean that consumers always see the product or know what it looks like prior to entering the store to purchase it. Both parties acknowledged that a referral by a health professional carries a lot of weight among baby bottle consumers. (R. 142, 593–94.) Avent, through marketing, is heavily networked with the health professional market, including pediatricians, lactation consultants, and child birth educators. (*Id.* at 141.) Those kinds of referrals carry enough weight that an expectant or new parent to whom the Avent bottle has been recommended would not necessarily feel the need to view the baby bottle prior to purchasing it. Thus, even those baby bottle consumers who exercise a high degree of care in selecting the product by following the advice of a health professional may not have seen the product prior to entering the store to purchase it. Thus, the Court rejects Playtex's theory that the magistrate judge should have given less weight to the similarity of the products due to the high degree of care used by baby bottle consumers.

## C. Area and Manner of Concurrent Use

■ Playtex avers that the magistrate judge erred in finding that the area and manner of concurrent use of the Avent and Avance bottles was similar. "The 'area and manner of concurrent use' factor requires us to consider whether there is a relationship in use, promotion, distribution, or sales between the goods or services of the parties." *Forum Corp. of N. Am. v. Forum, Ltd.*, 903 F.2d 434, 442 (7th Cir. 1990). "The parties need not be in direct competition and their goods and services need not be identical." *Id.*

The target market of both Avent and Playtex is the soon-to-be or new parent seeking a reusable baby bottle. The Avent bottle has a retail price of between $4.00 and $5.00 and the Avance bottle is priced between $4.00 and $4.50. (R. at

155–56.) In the mass retail stores, such as Target and Babies R' Us, the price of Avent and Avance bottles is the same. (*Id.* at 156.)

Both Avent and Playtex promote their product by displaying their products at the Juvenile Products Manufacturers Association convention and similar conventions. (*Id.* at 165–67.) Further, with two exceptions, Avent advertises its products in every magazine in which Playtex advertises its Avance bottle. (*Id.* at 148–49.) As discussed above, Avent relies on health professional networks and both Avent and Playtex rely on word-of-mouth referrals as part of their marketing effort. (*Id.* at 141, 523.)

At the time of the hearing, Avent products were distributed in Target, Babies R' Us, Burlington Coat Factory stores, specialty stores, and direct mail catalogs. (Id. at 139.) Christie, managing director and CEO of Avent America, testified that she personally inspected Target, Babies R' Us, Burlington Coat Factory, and several specialty stores, and found that Playtex distributed its Avance bottle in each store she visited. (*Id.* at 154.) It is undisputed that Avent and Playtex sell their bottles to Target and Babies R' Us stores, which account for 1,500 stores. (*Id.* at 112.) However, because Playtex also distributes in grocery and drug store chains, such as K–Mart, Eckert's, Walgreens, Safeway, and Albertson's, there are approximately one hundred types of stores where Playtex is distributing its bottle but Avent is not. (*Id.* at 201–03.) Christie testified that Avent products would be distributed in Toys R' Us by the end of 1998 and that Avent was actively pursuing distribution in Wal–Mart stores. (*Id.* at 139.) Seventy percent of Avent's sales are achieved through mass market retailers and that percentage is growing relative to Avent's shrinking distribution via independent specialty stores. (*Id.* at 140.)

In sum, the pricing of the Avent and Avance bottles is approximately the same in some stores and exactly the same in over 1,500 outlets. The advertising strate-gy is roughly the same—give or take two magazines. Although Playtex distributes to more stores, Avent and Playtex's distribution channels are similar and that gap is closing because of Avent's growth in distribution in mass market retail stores and shrinking specialty store distribution. Given these overwhelming similarities, the fact that Playtex is distributing its feeding system in grocery and drug stores is insufficient to warrant a finding that the area and concurrent use of the products is different.

**E. Strength of Complainant's Mark**

The Court may readily dispose of Playtex's argument that the magistrate erred in finding that the "Avent" mark is suggestive when the mark is merely descriptive. "Marks are classified into five categories of increasing distinctiveness: (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, and (5) fanciful." *Platinum Home Mortgage Corp. v. Platinum Fin. Group, Inc.*, 149 F.3d 722, 727 (7th Cir. 1998). "[T]he level of trademark protection available corresponds to the distinctiveness of the mark." *Id.* "A descriptive mark is one that 'describes the ingredients, qualities, or characteristics of an article of trade or a service' and, generally, it is not protected as a trademark...." *Id.* (quoting *M.B.H. Enters., Inc. v. WOKY, Inc.*, 633 F.2d 50, 54 (7th Cir.1980)). A suggestive term "requires the observer or listener to use imagination and perception to determine the nature of the goods." *Telemed Corp. v. Tel–Med, Inc.*, 588 F.2d 213, 217 (7th Cir.1978). Terms that are suggestive, arbitrary, or fanciful are "automatically entitled to trademark protection because they are inherently distinctive." *Id.*

Playtex argues that the Avent mark is descriptive because "Avent is 'a vent.'" (Def.'s Objections at 28.) The magistrate judge correctly found that the Avent bottle employs a valve-like, not a vent-like, action via air pressure to allow air to pass through the nipple apron. However, this

evidence does not deserve the amount of emphasis that either Playtex or the magistrate judge places on it. First, the capitalization and pronunciation of the "a" in "Avent," which Playtex admits sounds like the "a" in advent, prevent the connotations that Playtex proposes. (*See* Def.'s Objections at 18.) Second, Avent is a brand name, like Playtex, that is used to promote a host of products, not simply a bottle. For example, Avent does not describe (1) its pacifier, which would fail to work properly if there was a vent in it; and (2) its storage system, which would not provide an airtight seal if there was a vent in it. For the forgoing reasons, the Court finds that a tremendous amount of imagination is needed to connect the "Avent" mark with its baby bottle, pacifier, storage system, and other products. Thus, the "Avent" mark is not merely descriptive, and it is therefore deserving of trademark protection.

### F. Actual Confusion

 " 'There can be no more positive or substantial proof of the likelihood of confusion than proof of actual confusion. Moreover, ... while very little proof of actual confusion would be necessary to prove the likelihood of confusion, an almost overwhelming amount of proof would be necessary to refute such proof.' " *International Kennel Club of Chicago, Inc. v. Mighty Star, Inc.,* 846 F.2d 1079, 1089 (7th Cir.1988) (quoting *World Carpets, Inc. v. Dick Littrell's New World Carpets,* 438 F.2d 482, 489 (5th Cir.1971)).

Playtex argues that the magistrate judge never reached a conclusion as to whether the actual confusion prong favored either party. (Def.'s Objections at 20.) Because the magistrate judge in his Report clearly indicated that neither expert proved the existence or nonexistence of actual confusion, which plainly would create a neutral result for either party, Playtex's objection is without merit. (Rep. at 23–26.) Curiously, Playtex admits as much when it states, "The Report concluded that neither market survey should be

taken into account." (Def.'s Objections at 22.)

The Court, however, finds that the record shows the existence of actual confusion, albeit not in the form of expert testimony. Christie testified on direct examination that starting in January 1998, Avent's customer service people have been getting calls asking about Avent's angled bottle, a type of bottle that Avent does not sell. (R. at 152–53.) On cross examination, Christie actually fortified her testimony that Avent had received such phone calls and testified that in July 1998, her interrogatory answer stated that she had received:

> several telephone calls to Avent's customer service line, including among others a call placed by Diana Flores, other calls placed by customers or prospective customers of Avent and the general public, names unknown; other instances of confusion between Rose Weeks, Elliott Komerov, Susan Vorstein and individuals, names unknown. Investigation continues.

(*Id.* at 180.) The Court finds this evidence probative of the likelihood of confusion. Playtex began selling its Avance bottle, an angled bottle, in Target stores in mid to late December 1997. (*Id.* at 466–67, 485.) Avent began receiving calls about angled bottles, which it does not produce, in January 1998—roughly the same time that the Avance bottle hit the shelves. The fact that only a few telephone calls were documented is sufficient. The Seventh Circuit stated in *International Kennel* that "testimony of plaintiff's employees as to the instances of actual confusion, as well as [eight] letters indicating confusion provided ample support in the record for the trial court's finding that the plaintiff demonstrated a better than negligible chance of establishing the 'likelihood of confusion.' " 846 F.2d at 1090. Although there are no letters in the instant case, the Court finds that the testimony of Christie as to the instances of actual confusion supports a finding that Avent has shown a better than

negligible chance that there is likelihood of confusion. The Court thus modifies the magistrate judge's ruling to reflect a finding of actual confusion.

Lastly, Playtex argues that the magistrate judge's rejection of Dr. Michael Rappeport's survey was unjustified. After reviewing his testimony, the Court sees major flaws in Rappeport's methodology. Because it is undisputed that the Avent and Avance bottles look different, the Court focuses on the verbal survey, not the visual one.

The verbal test used the following methodology: (1) the interviewer read the names "Evenflo" and "Avent" (always in that order) to the interviewee; (2) the interviewer walked the interviewee to another room, in which eight bottles were displayed; (3) the bottle line-up did not include the Avent bottle but included the Avance bottle as well as the Evenflo bottle; (4) the interviewer then stated: "Here are a number of baby bottles. Do you see either of the bottles I mentioned here? Which bottle or bottles do you see?" (Id. at 430–31.)

The result of the verbal survey was five percent of the group either pointed out the Avance bottle or were confused as to whether the Avance bottle could be the Avent bottle. (R. at 398–99.) Rappeport testified that based upon the verbal and visual surveys, there was no meaningful likelihood of confusion in the marketplace between Avance and Avent bottles. (Id. at 400–01.)

First, the verbal test does not reflect what occurs in the marketplace because even Playtex agrees that baby bottle consumers enter the store knowing the system they are going to purchase. (R. at 525.) Thus, the interviewers should have only read the "Avent" name to the interviewees, instead of reading two names, "Evenflo" and "Avent." Further, sixty-four percent of the interviewees could not even recall the Avent name (which would make selecting a bottle based on the name impossible) and the Court finds that the failure to recall the Avent name would have been minimized if the interviewer had not read the Evenflo name. (See Def.'s Ex. 7, Study Results, at D02513.)

Second, the wording of the questionnaire was ambiguous. After the interviewer read the words "Evenflo" and "Avent" to the interviewee, the interviewer led the interviewee into a different room and asked, "Do you see either of the bottles I mentioned here?" The word "either" emphasizes that the interviewee may select one bottle, which would very likely be the Evenflo bottle because the Avent bottle was not displayed in the line up of eight bottles. Further emphasizing the interviewee's power to choose only one bottle, the next question stated: "Which bottle or bottles do you see?" (Id. at 430–31.) An appropriate line of questioning would have been: "Do you see either or both of the bottles I mentioned here?" and then "Which bottle or bottles do you see?" An even more appropriate line of questioning, if the Avent name was the only name read to the interviewee, would have been "Do you see the bottle I mentioned here?" This would simulate the situation where a baby bottle consumer, having been referred to Avent products, enters a grocery or drug store chain in which Playtex distributes its bottle but Avent does not. (Cf. R. at 203.)

Third, the magistrate judge properly was concerned about Rappeport's disregard of twenty-two survey responses, nine of which included responses that singled out the Avance bottle. Had these twenty-two responses been included, an additional five percent of those surveyed would have identified the Avance bottle after hearing the Avent name. Because Rappeport rejected this data for reasons the Court finds circuitous and unpersuasive, see R. at 403–04, the Court finds that the magistrate judge concerns regarding Rappeport's survey were reasonable. For the same reason, the Court rejects Rappeport's explanation for his opinion that the inclusion of these responses would have been favorable to Playtex. (R. at 404.) Therefore, the

Court finds that the magistrate judge's rejection of Rappeport's testimony was proper.[2]

## G. Intent

The crux of Playtex's argument regarding intent is that the magistrate judge erroneously found that Playtex intended to acquire Cannon Avent Group for the purpose of acquiring the Avent bottle. Playtex opines that it would be ludicrous for a large and diversified company such as Playtex to palm off its products as being connected with a small company like Avent. The Court disagrees and finds the record replete with support for the magistrate judge's factual finding.

It is undisputed that from 1994 to 1997, Avent America doubled its retail sales each year. (*Id.* at 205.) Further, a Playtex survey in the fall of 1997 showed that forty-nine percent of mothers indicated in the survey of 1,562 people that they had heard of Avent. (*Id.* at 520.) Richard Powers, President of the Personal Products Division of Playtex, testified that he was amazed at Avent's level of brand awareness. (*Id.* at 519.) Liistro testified that Avent's level of awareness was good considering its low level of distribution and that to achieve those results, Avent must have a good brand name. (*Id.* at 628, 632.)

Powers admitted that Playtex is not and never has been a leader in the reusable bottle market and has a less than ten percent share of that market in the United States. (*Id.* at 508.) Liistro conceded that in October 1997, Avent and Johnson & Johnson Healthflow "owned" the less-air positioning in reusable bottles and that Playtex knew that. (*Id.* at 631–32.) Thus, the Court rejects Playtex's characterization of Avent as a small niche company because the record supports that Avent is a dynamic rising star with unique products and amazing brand awareness, as well as being a leader compared to Playtex in the less-air positioning in reusable bottles.

It is also undisputed that Powers was aware of Avent in November of 1996. (*Id.* at 479.) Liistro was aware of Avent as early as 1994. (*Id.* at 479; 626; 640–41.) Liistro carefully studied Avent products and prepared an overview of the Avent line in a package of materials dated January 17, 1997 for Michael Goss, Executive Vice President and Chief Financial Officer of Playtex. (*Id.* at 479; 626; 640–41; Pls.' Ex. 27.)

Edward Atkin, managing director of Cannon Avent Group, which is the parent company of Avent America, testified that toward the end of 1996, he received an unsolicited letter from Goss in which Playtex communicated its interest in purchasing Cannon Rubber, which manufactures Avent baby feeding products and a line of motorcar accessories. (R. at 10, 47; Pls.' Ex. 27, Playtex Letter of 12/4/96, at D01863.) Although Atkin responded that he was uninterested in selling Cannon Rubber, Goss insisted that Atkin meet with him and the CEO of Playtex, Mr. Gallaher, when they were in London in January 1997. (R. at 52–53.)

At the January 1997 meeting, Goss and Gallaher made a presentation of the company and stated that Playtex wished to acquire the Avent bottle so that it would form part of their premium part of Playtex's baby feeding program. (*Id.* at 54.) Atkin again responded at the meeting that he was uninterested in selling Cannon Rubber. (*Id.*) Three or four months later, Playtex selected "Avance" as the name for its anti-vacuum bottle. (*Id.* at 536.)

The Court finds that the close temporal relationship between Playtex's pursuit of the acquisition of Cannon Rubber, Atkin's rejection of the sale, and the selection of the Avance name is probative evidence of

---

**2.** Playtex avers that the magistrate judge based its rejection of Rappeport's opinion solely on Judge Posner's admonishments of Rappeport's methodology in *Indianapolis Colts, Inc. v. Metropolitan Baltimore Football Club Ltd. Partnership,* 34 F.3d 410 (7th Cir. 1994). For the reasons provided, the Court disagrees and Playtex's own memorandum in support of its objections belies such an assertion. (Def.'s Objections at 23 n. 11.)

Playtex's intent to confuse consumers. Powers opines that Playtex's "focus is to be unique and different and to be unlike anything in the marketplace." (*Id.* at 479.) If this is the case, why then, of all the possible names would Playtex select the name "Avance" for its anti-vacuum bottle when there already was an anti-vacuum bottle named "Avent" on the market? The names are much too similar to be a coincidence. Further, the record shows that prior to Playtex's selection of the "Avance" name, it knew that the Avent bottle was unlikely to be sold in food and drug stores because of its price point. (Pls.' Ex. 27, at D01909.) Thus, Playtex knew that Avent had amazing brand awareness and that the Avent bottle would not be displayed side-by-side with the Avance bottle in any of the hundreds of grocery and drug stores in which Playtex sells Avance. (*Id.*) In addition, Playtex must and should have known all along how particularly important word-of-mouth referrals are in the baby bottle market which exacerbates the confusion. (R. at 523.) Therefore, for all of these reasons, the Court finds probative evidence that Playtex intended to confuse customers into thinking that the Avance bottle is connected with Avent when it chose a name that was strikingly similar to that of Avent's existing anti-vacuum bottle.

In sum, the Court finds that the marks and products are similar, the area and manner of concurrent use is similar, the degree of care in purchasing is greater than most products with similar price points, the Avent mark is strong; and there is evidence of actual confusion and evidence of Playtex's intent to confuse the consuming public into thinking that Playtex's Avance bottle is related to, connected with, or sponsored by Avent. Therefore, plaintiffs have successfully established that there is a better than negligible chance of success on the merits.

## 2. Inadequate Remedy at Law/Irreparable Harm

 Next, Playtex argues that the magistrate judge improperly found that plaintiffs have been injured. The Court, however, holds that the magistrate judge appropriately found that: (1) plaintiffs have an inadequate remedy at law; and (2) they will suffer irreparable harm if the injunction does not issue.

First, the record shows that plaintiffs have an inadequate remedy at law due to a loss of good will. Plaintiffs have built up Avent's good will since 1986. (R. at 13, 29.) Avent has an amazing amount of good will which is established by its forty-nine percent level of awareness among mothers and by its success in doubling its retail sales each year from 1994 to 1997. This good will is due, in large part, to the durability of the Avent bottle and the ease with which Avent bottles can be cleaned and sterilized. (*Id.* at 40; Pl.Ex., Media Advertising, at AAI–01742.) Avent bottles are manufactured using the injection stretch blow molding process—a process which results in a smoother internal surface and a longer lasting bottle than the extrusion blow molding process used by Playtex to manufacture Avance bottles. (*Id.* at 37–40.) Avarice bottles are made of a more malleable plastic and are more difficult to clean thoroughly due to the intricate cavities on the inside of the bottle created during the manufacturing process. (*Id.* at 38–40, 96.) One can determine merely by looking at the Avent and Avance bottles that the Avent bottle is made of strong plastic with an extremely smooth internal surface and the Avance bottle is made of a softer plastic with indents or cavities wherever there is an embossment for ounce measurements, instructions, and tiny decorative hearts. Because Avance bottles are not as durable or as easily cleaned as Avent bottles, Avent's good will is damaged each time a consumer mistakenly purchases Avance bottles. Thus, the Court finds that there is no adequate remedy at law for the damage to Avent's good will caused by confusion with Avance.

 Second, plaintiffs have satisfied the irreparable harm requirement. The presumption is well-established in this cir-

cuit "that injuries arising from Lanham Act violations are irreparable, even absent a showing of business loss." *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 16 (7th Cir.1992). The record shows that the Avent name has been and will be irreparably harmed by customers who mistakenly purchase or have purchased the Avance bottle and are disappointed in its hygienic qualities and longevity. Moreover, the record shows that it is likely that the damage to Avent's reputation will affect more than just one product line because Avent is the name of the company itself, which sells a host of products.

■ Playtex, however, opines that Avent's delay in pursuing an injunction negates this presumption. While it is true that the irreparable harm "presumption is overcome where the plaintiff delays in seeking injunctive relief," *Ohio Art Co. v. Lewis Galoob Toys, Inc.*, 799 F.Supp. 870, 887 (N.D.Ill.1992), the record shows that Avent did not delay in doing so.

Christie first learned of the Avance bottle in February 1998. (R. at 160.) After investigating the matter further, Avent then promptly sent a cease and desist letter to Playtex in March 1998. (*Id.*) In a letter dated April 7, 1998 and received by plaintiffs on April 9, 1998, Playtex denied any similarity between Avent and Avance in looks, sound, and connotation. (*Id.* at 161–62; Pls.' Ex. 15, Letter of 4/7/98.) Plaintiffs filed the instant action on April 30, 1998 and immediately filed a motion for preliminary injunction on May 5, 1998. (Court Docket Sheet, Entry 1, 8.)

These facts do not evidence any kind of delay on the part of plaintiffs to seek a preliminary injunction. When Christie first learned that the Avance bottle was available in stores, Christie and Atkin conducted proper research and then promptly sent a cease and desist letter to Playtex in March 1998 in order to prevent Playtex from continuing to using the confusingly similar name for its new bottle. The record shows that if any party is guilty of delay, it is Playtex because it took over one month for Playtex to respond to the cease and desist letter. As soon as Avent received Playtex's response in which it denied any similarity between Avent and Avance, Avent decided that it was time to resort to formal legal action. The plaintiffs filed their Complaint twenty-one days later and the Motion for Preliminary Injunction five days after that. Not only does the Court find Avent's course of action in this case reasonable, it finds it commendable. A finding otherwise would create an incentive for parties to file suit immediately without first trying to work out an amicable solution on their own. Moreover, Avent's cease and desist letter put Playtex on notice from a very early stage that Avent was challenging the confusing similarity of the Avance name. Because the Court does not find that Avent delayed in seeking its injunction, the presumption of irreparable harm remains intact.

### 3. Balance of Irreparable Harms

■ Because plaintiffs have cleared the threshold hurdles by showing an inadequate remedy at law and irreparable harm, the Court must consider "the irreparable harm the non-moving party will suffer if preliminary relief is granted, balancing that harm against the irreparable harm to the moving party if relief is denied." *Id.* at 11. "The stronger the likelihood that the plaintiff will win, the less of a showing he need make that the denial of the preliminary injunction would hurt him more than granting it would hurt the defendant." *Planned Parenthood of Wisconsin v. Doyle*, 162 F.3d 463, 465 (7th Cir.1998). "If the defendant is very likely to lose, allowing him to continue in his probably unlawful course of conduct until the end of what may be protracted proceedings would give him a windfall." *Id.*

■ As discussed above, the record shows that there is a substantial likelihood that plaintiffs will win, so less of a showing is required that the denial of the instant injunction would hurt plaintiffs more than granting it would hurt Playtex. But even

if there were a less than substantial likelihood of success, the balance of harms would still greatly favor Avent.

Playtex avers that if it were required to withdraw its product from the market while the litigation is pending, its entire investment of time, resources,[3] and reputation in launching the Avance bottle would be wasted and its good will in the marketplace would likely be damaged beyond repair. However, "'the courts will not shy away from issuing such [preliminary injunctive] relief where to do so would be to aid a second comer who has sought to trade upon the efforts and good will of the first comer.'" *Helene Curtis Indus., Inc. v. Church & Dwight Co., Inc.,* 560 F.2d 1325, 1333 (7th Cir.1977) (quoting *Colgate–Palmolive Co. v. North Am. Chem. Corp.,* 238 F.Supp. 81, 87 (S.D.N.Y. 1964)). This is especially true when a defendant has continued "its conduct after notice from plaintiff at a time when defendant could have reasonably have minimized its efforts and expenses and when no good will of major value had attached to its activities." *Id.*

The Court finds Playtex's arguments deserve little weight considering the substantial likelihood that Playtex is using an infringing trademark. Powers testified that prior to the distribution of the Avance product in stores, he was particularly inquisitive about the possibility of confusion between Avance and Avent and decided there was none. (R. at 480.) Playtex was on notice in March 1998 that the Avance mark infringed the Avent mark.[4] (*Id.* at 160.) Thus, Playtex received Avent's notice of infringement early enough so that Playtex could have proceeded in any number of ways to exercise caution in building consumer reliance on the Avance product, but Playtex chose not to do so. Further, Playtex has successfully marketed many of its products merely under the Playtex

name with no sub-brand. (*Id.* at 59–61, 69, 669–70.) Therefore, the removal of the Avance product from store shelves would only be temporary until the Avance name was eliminated, leaving only the Playtex name.

On the other hand, each and every day that Playtex's bottle is sold under the Avance name, Avent suffers irreparable harm. Avent's good will is damaged when customers, who are confused by the strong similarity between the Avent and Avance name, purchase the Avance bottle and are disappointed in its hygienic quality and longevity. Therefore, the Court finds that the harm to plaintiffs if no injunction is issued substantially outweights any harm to Playtex if an injunction is entered.

### 4. Public Interest

Lastly, the Court addresses "the public interest, which is 'the effect that granting or denying the injunctions will have on nonparties,'" *Meridian Mut., Ins., Co. v. Meridian Ins. Group, Inc.,* 128 F.3d 1111, 1121 (7th Cir.1997) (quoting *Grossbaum v. Indianapolis–Marion County Bldg. Auth.,* 100 F.3d 1287, 1291 (7th Cir.1996)). "In trademark infringement cases, ... [the Seventh Circuit] has stated that 'relevant consideration (in determining whether the public interest will be disserved by the grant of an injunction) is the consumer's interest in not being deceived about the products they purchased.'" *International Kennel Club of Chicago, Inc. v. Mighty Star, Inc.,* 846 F.2d 1079, 1092 n. 8 (7th Cir.1988) (quoting *A.J. Canfield v. Vess Beverages, Inc.,* 796 F.2d 903, 909 (7th Cir.1986)).

The Court finds that the consumer's interest in not being deceived by the Avance mark is strong. Consumers have a right to be unimpeded by conclusion in their

---

**3.** As a threshold matter, monetary damages can never constitute irreparable harm because the legal remedy of damages is adequate. *Chicago Typographical Union, No. 16 v. Chicago Newspaper Publishers' Ass'n,* 620 F.2d 602, 604 (7th Cir.1980). Thus, monetary

damages do not affect the balance of irreparable harm.

**4.** The first formal press release to the media regarding the launching of Playtex's Avance bottle system was dated in late March 1998.

efforts to purchase the Avent baby feeding system. Although the injunction may temporarily interrupt the availability of replacement products for those who have already purchased Playtex's Avance bottles, the Court finds that a greater public interest will be served by eliminating the confusingly similar Avance mark.

### Conclusion

For the forgoing reasons, the Court accepts the Report of Magistrate Judge Keys with some modification and grants the plaintiffs' motion for a preliminary injunction. The Court hereby issues an injunction prospectively restraining Playtex from using the Avance trademark.